IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | | |
|---|---|---|
| BRITTANI ATWOOD | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:20-cv-00056 |
| | ) | |
| v. | ) | JUDGE CAMPBELL |
| | ) | MAGISTRATE JUDGE HOLMES |
| JCF RESIDENCES MANAGEMENT COMPANY; JCF RESIDENCES DEVELOPMENT COMPANY, LLC; and JOHN FITZMAURICE, | ) ) ) ) ) | |
| Defendants. | ) | |

# MEMORANDUM

Pending before the Court is Defendants' Motion for Summary Judgment. (Doc. No. 23). Plaintiff filed a Response (Doc. No. 31-1) and Defendants filed a Reply (Doc. No. 32). Defendants also filed Statement of Material Undisputed Facts (Doc. No. 25), to which Plaintiff responded (Doc. No. 30).

For the reasons stated below, Defendants' Motion will be GRANTED in part, and DENIED in part.

## I. BACKGROUND

Defendant JCF Residences Management Company, LLC ("JCF") and its affiliated entities design, develop, and manage rental communities consisting of custom modular homes designed and built by JCF. (Doc. No. 30, ¶ 1). Defendant John Fitzmaurice is the owner and CEO.[1] (*See* Doc. No. 24 at 2 (citing J. Fitzmaurice Dep., Doc. No. 23-5 at PageID# 493-94)). Plaintiff Brittani Atwood began working for the company in February 2018 in an administrative capacity with the

---
[1] John Fitzmaurice's son, Ryan Fitzmaurice, also worked for JCF. Unless stated otherwise, all references to Mr. Fitzmaurice refer to John Fitzmaurice.

1

understanding that, over time, she would transition into a development and design role with the company. (Doc. No. 30, ¶ 6).

In late October 2019, JCF hired a new employee to assume Ms. Atwood's administrative duties in purchasing and invoicing. After a training period, Ms. Atwood began transitioning into her role in home design and development. (Doc. No. 30, ¶ 8). She continued to help with administrative duties while she was working on home design and development. (Doc. No. 30, ¶ 10).

In March 2020, the COVID-19 coronavirus began to spread throughout the United States. President Trump declared a national emergency and governors declared a state of emergency, urged people to stay home, and instituted a number of other measures to prevent the spread of the virus.[2] On March 16, 2020, Mr. Fitzmaurice sent an email to JCF employees to address the potential impact of the COVID-19 pandemic. (Doc. No. 23-2 at PageID # 318). He assured employees that JCF was "well situated to handle this temporary slow down and inconvenience" and encouraged them to "abide by the proper guidelines being suggested by our health officials." (*Id.*).

Ms. Atwood responded with an email to Mr. Fitzmaurice, informing him that her 10-year-old daughter's school was closed until April 3, 2020, and that she was "working on a plan for childcare for the next few weeks." (*Id.*). She added that she might need to take a personal day to drive her daughter to Alabama to stay with her parents. (*Id.*).

---

[2] *See e.g.*, Proclamation No. 9994, *Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, 85 Fed. Reg. 15,337 (March 13, 2020); Executive Order No. 14 by Governor of Tennessee, *An Order Suspending Provisions of Certain Statutes and Rule in Order to Facilitate the Treatment and Containment of COVID-19* (March 12, 2020) (declaring a state of emergency); Executive Order No. 17 by Governor of Tennessee, *An Order to Mitigate the Spread of COVID-19 by Limiting Social Gatherings, Dine-In Service, and Gym Use, and Exposure at Nursing and Retirement Homes, and Providing Flexibility for Restaurants Regarding the Sale of Alcohol* (March 22, 2020).

Mr. Fitzmaurice responded immediately: "We are all in this together. Feel free to share time between work and home. You live close. Take advantage. Check in with work, call in, stop by work, etc., let's all balance this together." (*Id*. at PageID# 317). Ms. Atwood replied, "I might work from home some afternoons, if we can't make Alabama workout. My mind is blown that it has come to this. Assuming they go back to school on April 6th, she will have been out of school for 31 days. CRAZY." (*Id*.). He responded, "We will all have some change of habits over the next several weeks. No worries on kids. Totally covered." (*Id*.).

It goes without saying that the COVID-19 pandemic did not end swiftly, and Ms. Atwood's daughter did not return to school on April 6th. (*See* Doc. No. 32-2 at PageID# 320 (school attendance since the beginning of COVID school closure)). School remained closed for in-person instruction for the remainder of the academic year. (*Id*.).

After March 16, 2020, Ms. Atwood worked from home about one day a week, usually on Fridays, and took a number of personal days. (Doc. No. 30, ¶ 12). Ms. Atwood states that, in keeping with company policies and practices, she informed Mr. Fitzmaurice on occasions when she would not be in the office. (Atwood Dep., 107; Coil Dep. 162-63, 169-77; Passow Dep. 183-184). All of her requests to work from home or for personal days were approved by John Fitzmaurice or Brian Coil, the project manager for construction and development who also oversaw her work. (Doc. No. 30, ¶¶ 9, 12). Ms. Atwood concedes that on the days she was working from home she spent a significant amount of time watching and caring for her daughter and she found it more difficult to respond to emails. (*Id*., ¶¶ 13-14). However, she testified that she felt she was as productive at home as in the office, noting that "the office had its own set of distractions." (Atwood Dep., Doc. No. 23-1 at PageID# 195).

3

On May 12, 2020, Plaintiff met with John Fitzmaurice and Brian Coil. (Doc. No. 30, ¶ 19). Plaintiff recorded the first few minutes of the meeting. (Transcript, Doc. No. 23-2 at PageID# 304-08). She testified that she decided to record the meeting because, based on the reaction she got when she had to leave early the previous workday because her son was injured, she felt "the tone was changing in the office" and that "this was going in a direction [] that wasn't in my favor." (Atwood Dep., Doc. No. 23-1 at PageID# 154).

During the meeting, Mr. Fitzmaurice told Ms. Atwood that she was "gone too much … [t]hat's going to be over" and that he was "done with her absences and lack of commitment." (Transcript, Doc. No. 23-2 at PageID# 306-07). This was followed by a discussion of deadlines related to getting drawings to or from the architect and factory manager. (*Id*.). Plaintiff contends the focus of the meeting was her "absences" and that her takeaway from the meeting was that she could no longer work from home. (Atwood Dep., 23-1 at PageID# 171).

Defendants contend that after Ms. Atwood transitioned to the design and development role, she was often late in responding to emails and she failed to perform the duties required of her new role. (Doc. No. 30, ¶ 16). Defendants identify several perceived delays in providing design plans or responding to emails. (*Id*.). All but one occurred during April and May 2020. (*See* Doc. No. 23-2 at Page ID# 310-315). Plaintiff contends that there were no material delays, noting that the factory manager, DeWayne Blackwell, and the architect, Keith Shutz, testified that they had no complaints about her work. (Shutz Dep., Doc. No. 30-7 at 23-35; Blackwell Dep., Doc. No. 30-2 at 63). Plaintiff claims that she did not receive any criticism of her job performance until she was terminated on June 6, 2020. (Atwood Dep., Doc. No. 30-1 at 100-103, 251).

On May 18, 2020, Mr. Fitzmaurice had Plaintiff removed from the company website. (Doc. No. 23-10 at PageID# 705). The afternoon of May 20, 2020, Plaintiff emailed John Fitzmaurice

4

and Brian Coil requesting to take time off the following day to attend an end of year event at her daughter's school. (Doc. 23-2 at PageID# 331). That evening, Mr. Fitzmaurice emailed Plaintiff approval for the requested time off and, in the same email, wrote, "Brian, Have Andy rev up to take care of home design development as discussed." (*Id*.). Mr. Fitzmaurice claims that by this time, after collecting input from others, he had decided to terminate Ms. Atwood's employment "due to her continued failure to demonstrate a commitment to adequately perform her job duties." (J. Fitzmaurice Dep., Doc. No. 23-5 at PageID# 513-14; Coil Dep., Doc. No. 23-3 at PageID# 441-42).

The following day, May 21, 2020, apparently after consulting with a friend with experience in human resources, Plaintiff sent an email to John Fitzmaurice, Brian Coil, and Jennifer Moore, who worked in human resources, requesting leave under the Families First Coronavirus Response Act ("FFCRA"). (Doc. No. 23-2 at PageID# 349). She wrote:

> Due to the Coronavirus pandemic, Williamson County School have been closed since March 6, 2020 and all extracurricular activities and summer camps have been canceled for the foreseeable future. These major life changes have left us without childcare for Aubrey. I would like to apply for emergency paid sick leave and/or expanded family medical leave under the Family First Coronavirus Response Act. Please let me know how to proceed with a formal application.

(*Id*.).

The next afternoon, May 22, 2020, the company sent Plaintiff paperwork to formally request FFCRA leave. (Doc. No. 30, ¶ 26). Plaintiff returned the completed paperwork the following business day, requesting emergency paid sick leave and emergency family medical leave beginning May 22, 2020.[3] (*Id*.). Plaintiff received an email from human resources confirming

---

[3] Plaintiff received the paperwork on Friday, May 22, 2020, and returned the completed paperwork on Monday, May 25, 2020. (Doc. No. 30, ¶ 26).

5

receipt of the paperwork, (Atwood Dep., Doc. No. 23-1 at PageID# 273 ("Thanks, Brittani, I'll make sure this gets set up and taken care of.")).

On June 4, 2020, John Fitzmaurice emailed a termination notice to Plaintiff at her personal and company email accounts. (Doc. No. 23-2 at PageID# 363). The letter stated:

> Dear Brittani,
>
> As we have discussed, your job performance has been substantially below expectations for some time. In early May, we concluded that your uncorrected job performance would require ending our employment relationship with you in the near future. As you know, on May 20, 2020, we reassigned your primary job responsibility, home design development, to another employee to address your continued failure to complete it. Upon that reassignment, management decided to terminate your employment on or before May 31.
>
> On May 21, the day after your duties had been reassigned and that decision was made, you requested leave as a result of the loss of childcare. Although the Company was in the process of finalizing your termination, because we had not yet informed you of the Company's decision, we provided you with paperwork to request leave. Given these circumstances, we approved your leave as emergency paid sick leave from May 25, 2020, through June 8, 2020.
>
> As of May 20, 2020 when your home design development duties were reassigned for performance reasons, your job effectively ceased to be needed. Your employment will separate effective June 8 for the reasons stated above, and we are not approving any leave beyond that date.
>
> The Company is willing to offer you severance:
>
> - Your June 8, 2020 separation will be deemed voluntary resignation instead of an involuntary termination.
>
> - You will receive severance in the total amount of $12,979.40, less applicable withholdings, paid in installments on the Company's regular paydays through August 7, 2020, which is equivalent to the paid leave to which you may have been eligible had your employment duties not been reassigned on May 20 and your employment slated for termination by May 31.
>
> - In exchange, you will sign the attached severance agreement.
>
> This offer will remain open for your consideration until Monday, June 8, 2020. In the meantime, please make arrangements to have the Company's

computer and any other Company property in your possession returned immediately.

(*Id.*). Plaintiff did not accept the Company's severance offer, and this lawsuit followed. (Atwood Dep., Doc. No. 23-1 at PageID# 285).

Plaintiff brings claims alleging violations of the Emergency Family Medical Leave Act and the Emergency Paid Sick Leave Act (Counts I-IV), and, in the alternative, claims for breach of contract and promissory estoppel (Counts V and VI).

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks,* 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the nonmoving party's case. *Id.*

In evaluating a motion for summary judgment, the court views the facts in the light most favorable for the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 242 (6th Cir. 2015); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the Court determines whether sufficient evidence has been presented to make the issue of material fact a proper jury question. *Id.* The mere scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary

judgment; instead, there must be evidence of which the jury could reasonably find for the nonmoving party. *Rodgers* 344 F.3d at 595.

### III. ANALYSIS

**A. Families First Coronavirus Response Act**

The Families First Coronavirus Response Act ("FFCRA") was signed into law on March 18, 2020, with an effective date of April 2, 2020. Pub. L. No. 116-127, 134 Stat. 178 (2020); 29 C.F.R. § 826.10(b). The FFCRA created two acts: the Emergency Family and Medical Leave Expansion Act ("EFMLEA") and the Emergency Paid Sick Leave Act ("EPSLA").

**B. EFMLEA Claims**

The EFMLEA temporarily amends the Family Medical Leave Act ("FMLA") to entitle certain employees to twelve weeks of leave per year "because of a qualifying need related to a public health emergency." 29 U.S.C § 2612(a)(1)(F). A qualifying need includes if "the employee is unable to work (or telework) due to a need for leave to care for the son or daughter under the age of 18 years of age of such employee if the school or place of care has been closed, or the child care provider of such son or daughter is unavailable, due to a public health emergency." 29 U.S.C. § 2620(a)(2)(A). EFMLEA leave is paid at two-thirds the employee's regular rate of pay. 29 C.F.R. § 826.24. Claims for interference and retaliation under the EFMLEA may be brought under the enforcement provisions of the FMLA, 29 U.S.C. § 2617. 29 C.F.R. § 826.151.

Plaintiff brings claims for interference with and retaliation related to exercise of her rights under the EFMLEA. (Doc. No. 1 (Counts I and II)). The Court applies the familiar *McDonnell-Douglas* burden shifting framework whereby the Plaintiff must first establish a prima facie claim of interference or retaliation.[4] If the Plaintiff establishes a prima facie claim, the burden then shifts

---

[4] The parties agree that interference and retaliation claims under the EFMLEA are evaluated under the same standard as parallel claims under the FMLA, including application of the *McDonnell-Douglas*

8

to the employer to provide a legitimate reason for the termination. The Plaintiff must then put forth evidence to show that the employers stated reason is pretextual. *See Jaszczyszyn v. Advantage Health Physician Network*, 504 F. App'x 440, 447-48 (6th Cir. 2012) (FMLA interference claim); *Labelle v. Cleveland Cliffs, Inc.*, 784 F. App'x 437, 443 (6th Cir. 2019) (FMLA retaliation claim).

To establish a prima facie interference claim under the EFMLEA, a plaintiff must show that: (1) she was an eligible employee; (2) the employer was an employer as defined under the EFMLEA; (2) she was entitled to leave under the EFMLEA; (4) she gave the employer notice of her intent to take leave; and (5) the employer denied her EFMLEA benefits to which she was entitled. *Thornberry v. Powell Cty. Detention Ctr.*, No. 5:20-271-DCR, 2020 WL 5647483, at * 3 (E.D. Ky. Sept. 20, 2020) (quoting the elements for an FMLA interference claim from *Donald v. Sybra, Inc.*, 667 F.3d 757 (6th Cir. 2012)); *see also Giles v. Wilson Cty. Bd. of Educ.*, No. 1:17-cv-896, 2018 WL 4680335, at * 4 (M.D. Tenn. Sept. 28, 2018) (citing *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006)).

To establish a prima facie retaliation claim under the EFMLEA, Plaintiff must show that: (1) she was engaged in activity protected by the EFMLEA; (2) the employer knew that the employee was exercising her rights under the EFMLEA; (3) after learning of Plaintiff's exercise of EFMLEA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected EFMLEA activity and the adverse employment action. *See Thornberry*, 2020 WL 5647483, at * 4; *Giles*, 2018 WL 4680335, at * 4.

Defendants do not challenge that Plaintiff is an "eligible employee" or that JCF is an "employer" as defined in the EFMLEA. They argue, however, that Plaintiff did not seek leave for

---

burden shift framework and the elements of prima facie claims. (*See* Def. Br., Doc. No. 24 at 13-20; Pl. Br., Doc. No. 31-1 at 13).

a qualifying reason, that she did not provide timely notice of her intent to take leave, and that because JCF decided to terminate her employment before she made a formal request for EFMLEA leave, she cannot establish a causal connection between her request for leave and termination.

1. Qualifying Reason

Defendants argue that Plaintiff did not request leave for a reason protected under the law because she did not make a formal request for leave until schools were closed for the summer, which was a scheduled closure not due to COVID-19.

Plaintiff asserts that she adequately informed Defendants of her need for FFRCA qualifying leave due to school closures as early as March 16, 2020. She initially sought flexibility to be able to work from home and raised the possibility that she might need to "take a personal day" to handle childcare responsibilities. Plaintiff adds that, though this date was prior to the enactment and effective date of the FFRCA, she regularly requested to work from home or for personal days due to the need to care for her daughter while schools were closed. At the end of the school year, when it became apparent that JCF would no longer allow her to work from home, Plaintiff formally requested leave under the FFCRA because she was without care for her daughter due to COVID-19 closures. In that formal request, Plaintiff noted that due to the COVID-19 pandemic her daughter's school had been closed since March 2020 and summer camps were cancelled for the summer.

Under the FMLA, the standard for providing notice to an employer of the need for qualifying leave must simply be "reasonably adequate to apprise the employer" of the need to take leave and "need not specifically mention the FMLA." *Miles v. Nashville Elec. Serv.*, 525 F. App'x 382, 385 (6th Cir. 2013). If an employer requires additional information regarding an employee's

request for leave under the EFMLEA, the employer "should give the employee an opportunity to provide the requested documentation prior to denying the request for leave." 29 C.F.R. § 826.90(a).

Plaintiff has submitted sufficient evidence from which a reasonable jury could conclude that she provided "reasonably adequate notice" to JCF that she was requesting time off due to a qualifying reason under the EFMLEA. Plaintiff submitted evidence that she requested time off to care for her daughter because of COIVD-19 related school closures as early as March 16, 2020. While the EFMLEA had not been enacted at that time, Plaintiff continued to request intermittent time off or away from the office to allow her to care for her daughter.

Moreover, the formal request for leave under the FFCRA clearly stated, both in the email and on the EFMLEA form, that she was requesting leave because of "no childcare due to school/summer camp closures, directly related to COVID-19."[5] (Doc. No. 23-2 at PageID# 361). Defendants' contention that, because Plaintiff only listed her daughter's school on the line for "Name(s) of school(s) or place(s) of care that have been closed," she was ineligible for leave is hypertechnical and misplaced. Not only did the EFMLEA form specifically state that she was requesting leave because her daughter's summer camps were closed due to COVID-19, the regulations clearly provide that an employer should request additional information if the notice is deficient. *See* 29 C.F.R. § 826.90(a).

2. Timing of the Notice

Relying again on the date of Plaintiff's formal written request for leave, Defendants contend that her notice of the need for leave was untimely. Plaintiff disagrees, arguing that she provided Defendants notice of her need for leave due to school closure as early as March 16, 2020.

---

[5] The FFCRA definition of "place of care" specifically includes schools and summer camps. 29 C.F.R. § 826.10(a).

Moreover, the need to formally request an extended absence did not become apparent until Plaintiff was informed on May 12, 2020, she could no longer work from home as needed.

The regulations provide that notice of the need for leave should be provided to the employer "as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 826.90(b) (timing and delivery of notice). As stated above, Plaintiff has submitted evidence that she provided notice of her need for leave due to the need to provide childcare for her school-age daughter when school closed due to COVID-19 as early as March 16, 2020, and on numerous occasions thereafter. In fact, Defendants acknowledge that Plaintiff made various "informal requests for personal days or working from home," but argues that these were not requests for FFCRA leave. (Doc. No. 32 at 4).

Plaintiff has not stated when it became apparent that summer camps would be closed for the summer. However, in light of the fact that she had been balancing childcare responsibilities in part by working from home and that it was not until May 12, 2020, that she learned that working from home was no longer an option, a finder of fact could conclude that the need for EFMLEA leave did not arise until that time. Construing the facts in the light most favorable to Plaintiff, the Court cannot conclude as a matter of law that Plaintiff's EFMLEA claims fail for failure to provide sufficient notice.

3. Causation

Defendants argue that the interference and retaliation claims fail because it decided to terminate Plaintiff before she formally requested FFCRA leave and there is no evidence of a causal connection between her request for protected leave and an adverse action.

As an initial matter, there are questions of fact regarding when JCF decided to terminate Plaintiff. Even Defendants do not appear to know an exact date. Defendants state that the decision

12

was definitely made by May 20, 2020, noting that Plaintiff was removed from the website on May 18, and her job duties reassigned on May 20. (Doc. No. 24 at 20). Defendants concede however, that she had not been formally terminated at that time, and stated that as of May 21, 2020, the day she formally requested leave under the FFCRA, her termination was "imminent." (Doc. No. 32 at 3). Plaintiff herself was not informed she was terminated until June 4, 2020. (*Id*.).

Not only does Defendants' causation argument rely largely on an unsettled termination date, it assumes that Plaintiff did not provide notice of her need for leave until after May 20. As discussed above, Plaintiff has provided evidence from which a finder of fact could conclude that she requested leave prior to that date.

Returning to the *McDonnell-Douglas* framework, the Court finds Plaintiff has established prima facie claims of EFMLEA interference and retaliation. Defendants provided a reason for her termination that is unrelated to her claim for FFCRA leave, stating that she was terminated for poor performance. The burden then shifts back to Plaintiff to provide evidence from which a reasonable jury could conclude the reasons given for termination were pretext for interference and/or retaliation.

Plaintiff points to evidence that the real reason for her termination was her perceived excessive absence from the office due to her need to care for her school-age daughter during COVID-19 related school closures. Indeed, at the May 12, 2020 meeting, John Fitzmaurice plainly expressed his view that she was "gone too much" and that he was "done with her absences and lack of commitment." (Transcript, Doc. No. 23-2 at PageID# 306-07). With regard to the alleged concerns with the quality of her work, specifically delays in getting plans to the architect or factory manager, Plaintiff points to testimony from the factor manager and architect stating that they had no complaints about her work and that she was not the cause of any delays. (Shutz Dep. at 23-35;

13

Blackwell Dep. at 63). In addition, Plaintiff claims that she did not receive any criticism of her job performance until she was terminated on June 6, 2020. (Atwood Dep., Doc. No. 30-1 at 100-103, 251).

Viewed in the light most favorable to the Plaintiff, there are questions of fact regarding whether she was terminated due to requesting leave under the EFMLEA. Accordingly, the motion for summary judgment on her claims for EFMLEA interference and retaliation will be denied.

**C.    EPSLA**

Plaintiff also brings claims for wrongful denial of paid sick leave and retaliation under the EPSLA. The EPSLA is a separate provision of the FFCRA that provides for two weeks of paid sick leave under qualifying circumstances. ESPLA leave is paid at the employee's full regular rate of pay. 29 C.F.R. § 826.22. Like the EFMLEA, qualifying circumstances under the EPSLA include "when an Employee is unable to work because the employee is caring for a child whose school or place of care is closed or unavailable for reasons related to COVID-19." 29 C.F.R. § 826.20(a)(1). The Act prohibits employers from discharging, disciplining, or discriminating against any employee because the employee took paid sick leave under the EPSLA. 29 C.F.R. § 826.150(a).

The enforcement provisions for failure to provide paid sick leave under EPSLA are tied to the Fair Labor Standards Act ("FLSA"). § 5105, 134 Stat. at 197. "An employer who fails to provide emergency paid sick leave under the EPSLA is considered to have failed to pay the minimum wage as required by [ ] the FLSA" and is subject to the enforcement provisions of the FLSA. 29 C.F.R. § 826.150.

The elements of a retaliation claim are identical to those for retaliation under the EFMLEA except that Plaintiff must show that she engaged in protected activity under the EPSLA rather than the EFMLEA. To establish a prima facie case of retaliation under the EPSLA, Plaintiff must show

14

(1) she engaged in protected activity under the EPSLA; (2) the employer knew of the protected activity; (3) the employer took an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Colombe v. SGN, Inc.*, No. 5:20-cv-374-REW, 2021 WL 1198304, at * 3 (E.D. Ky. Mar. 29, 2021) (citing elements of an FLSA retaliation claim).

The arguments asserted by the parties with regard to the EPSLA retaliation claim parallel those made with regard to the EFMLEA retaliation claim discussed above. For the reasons already discussed, the Court finds there are questions of fact for the jury with regard to the cause for Plaintiff's termination. Accordingly, Defendants' motion for summary judgment on the EPSLA retaliation claim will be denied.

As to whether Defendants failed to provide paid sick leave to which Plaintiff was entitled, Defendants argue that Plaintiff was not entitled to paid sick leave for the reasons discussed above with regard to EFMLEA leave, and that even if she were entitled to leave, they paid her for two weeks of sick leave and have, therefore, satisfied any obligations under the EPSLA.

Plaintiff acknowledges that JCF paid her after her last day of work, ostensibly for emergency paid sick leave under the EPSLA. However, she disputes that they paid the full two-weeks of sick leave owed and now contends that she is entitled to an additional unspecified amount of unpaid sick leave, as well as liquidated damages permitted under 29 U.S.C. § 216(b).

There is no dispute that Plaintiff was paid some amount of sick leave under the EPSLA. Her last day of work was May 22, 2020. She received two paychecks after that date: one check for $3,828.43 for the period May 16, 2020 through May 31, 2020, and a second check for $1,442.16 for the period June 1, 2020 through June 5, 2020. (Doc. No. 23-2). Whether this amount equaled two weeks of pay requires some calculation.

The applicable regulations direct that calculations of salary for periods other than a workweek must be reduced to a workweek equivalent. *See* 29 C.F.R. § 778.113; 29 C.F.R. § 826.25. For employees like Plaintiff who are paid semimonthly, the weekly rate is determined by multiplying semimonthly pay by 24 and dividing by 52. *Id.* Plaintiff was paid semimonthly at a rate of $3,845.75 per pay period. (*See* Paychecks, Doc. No. 23-2). Applying the calculations as directed by the Regulations, Plaintiff's weekly rate of pay is $1,774.96 ($3,845.75 x 24 ÷ 52 = $1,774.96). Two weeks of pay is $3,549.92. The final paychecks issued to Plaintiff covered three workweeks (two weeks of sick leave and one regular week). Three weeks of pay at Plaintiff's regular rate equals $5,324.88 ($1,774.96 x 3). Plaintiff's final paychecks for this three-week period totaled $5,270.59.[6] By this calculation, it appears Plaintiff, if entitled to paid sick leave under the EPSLA, should have been paid an additional $54.29. Defendants' method of calculation proposed in the memorandum incorrectly attribute an excessive portion of the May 31, 2020 paycheck to sick leave by including the weekends as part of paid sick time.[7]

As discussed above, and particularly in light of Defendants' approval of EPSLA leave, there are questions of fact regarding Plaintiff's entitlement to emergency paid sick leave. Although

---

[6]  She received a paycheck for May 16, 2020 through May 31, 2020, for $3,828.43, and a paycheck for the period from June 1, 2020 through June 5, 2020 for $1,442.16.

[7]  Defendants' method of calculation is effectively a calculation for daily rate of pay, which is calculated by dividing the monthly salary by the number of days in the month. In May 2020, there were 20 workdays (assuming Memorial Day was a holiday). Therefore, Plaintiff's daily rate of pay for May 2020 was $384.58 ($3,845.75 x 2 ÷ 20). Plaintiff should have been paid $1,922.88 for the week of May 18-22, 2020, and the same amount in paid sick leave for the week of May 25-29, 2020. The month of June 2020 has 22 workdays. Therefore, Plaintiff's daily rate of pay for June 2020 was $349.61 ($3,845.75 x 2 ÷ 22). Using a daily rate calculation, Plaintiff should have been paid $1,748.07 for the week of June 1-5, 2020. The total for the three weeks under this method is $5,593.83, slightly more than using the weekly calculation method. In any event, under either method, Plaintiff was not paid for two full weeks of sick leave.

The Court notes that none of the methods of calculation results in the amount Plaintiff was actually paid. Defendants have not explained how they determined the amount Plaintiff was paid in her final two paychecks.

the amount is relatively small, based on the Court's calculations, it appears Plaintiff may not have been paid the full amount for two weeks of emergency sick leave. Accordingly, Defendants' motion for summary judgment on the claim for wrongful denial of EPSLA emergency paid sick leave will be denied.

**D.     Breach of Contract and Promissory Estoppel**

In Tennessee, the "employment-at-will doctrine" applies to employment relationships not covered by a contract for a definite term of employment. *See Chavez v. Broadway Elec. Service Corp.*, 245 S.W.3d 398, 403 (Tenn. Ct. App. 2007) (noting that employment-at-will has been the law in Tennessee for more than a century). Unless there is a contract for a definite term, employers are generally permitted to terminate the employment relationship "at any time for good cause, bad cause, or no cause." *Id*. (quoting *Crews v. Buckman Labs. Intern., Inc.*, 78 S.W.3d 852, 857-58 (Tenn. 2002); *see also*, *Shelby v. Delta Airlines*, 842 F. Supp. 999, 1006 (M.D. Tenn. 1993) (same). Accordingly, a discharged employee generally cannot recover from an employer for breach of contract or promissory estoppel based on termination of employment because there is no right to continued employment. *See e.g.*, *Koch v. Lightning Transp., LLC*, No. 3:13-cv-0225, 2015 WL 66971, at * 7, *9 (M.D. Tenn. Jan. 6, 2015) (dismissing claims for breach of contract and promissory estoppel because, under the at-will-employment doctrine, defendants were entitled to terminate, decline to rehire, or not allow plaintiff to return to work following maternity leave despite their promise to the contrary).

Under this backdrop the Court considers Plaintiff's claims for breach of contract and promissory estoppel. A breach of contract claim requires, first and foremost, an enforceable contract. Under Tennessee law, an enforceable contract "must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon sufficient consideration, free from

fraud or undue influence, not against public policy and sufficiently definite to be enforced." *Woodall v. DSI Renal, Inc.*, No. 11-2590, 2012 WL 1038626, at * 6 (W.D. Tenn. Mar. 27, 2012).

Promissory estoppel is available when the defendant makes "a promise which the promisor should reasonably expect to induce action or forbearance on the part of a promisee or a third person and which does induce such action or forbearance." *Barnes & Robinson Co. v. OneSource Facility Serv.*, 195 S.W.3d 637, 645 (Tenn. Ct. App. 2006); *see also*, *Alden v. Presley*, 637 S.W.2d 862, 864 (Tenn. 1982). Although promissory estoppel does not require the existence of an enforceable contract, the promise that is the basis for the claim must be "unambiguous and not unenforceably vague" and the plaintiff's reliance on the promise must have been reasonable. *Chavez*, 245 S.W.3d at 404-05.

The basis for Plaintiff's breach of contract and promissory estoppel claims is the same. Plaintiff argues that Defendants promised to allow her to "share time between work and home" and that terminating her because she was not in the office enough was a breach of this promise. Defendants argues that the claims for breach of contract and promissory estoppel are foreclosed by Plaintiff's undisputed status as an at-will employee. In addition, Defendants argue that the March 16 email exchange was too vague to create an enforceable contract or promise.

The Court agrees. There is no dispute that Plaintiff was an at-will employee. As such, under Tennessee law, she had no right to continued employment and Defendants could terminate her employment for "good cause, bad cause, or no cause." For this reason alone, Plaintiff is not entitled to damages arising out of her termination on a breach of contract or promissory estoppel theory. *See Bryant v. MT Dev. Co.*, No. 3:06-cv-0458, 2007 WL2343682, at * 3 (M.D. Tenn. Aug. 13, 2007) ("Tennessee law does not allow promissory estoppel claims for breach of at-will employment agreements because doing so would undermine the employment at-will doctrine.")

(citing *Chavez*, 245 S.W.3d at 404); *Shelby*, 842 F. Supp. at 1006; *Koch*, 2015 WL 66971, at * 7, *9.

Moreover, the statements made by John Fitzmaurice on March 16, 2020, were insufficient to create either a contract or an enforceable promise. While he stated Plaintiff could "share time between work and home," there was no discussion or agreement as to how often Plaintiff could work from home or how long the work from home arrangement would last. At best, Fitzmaurice agreed Plaintiff could share time between work and home for a few weeks. ((Doc. No. 23-2 at PageID # 317) (responding to Plaintiff's notice that schools were closed until April 3, 2020, he wrote, "We will all have some change of habits over the next several weeks. No worries on kids. Totally covered.")). In any event, there were no promises of continued employment that would alter Plaintiff's status as an at-will employee.

Accordingly, Defendants are entitled to judgment on Plaintiff's claims for breach of contract and promissory estoppel.

## IV. CONCLUSION

For the reasons discussed above, Defendants' Motion for Summary Judgment (Doc. No. 23) will be GRANTED with regard to Plaintiff's claims for breach of contract and promissory estoppel (Claims V and VI), and DENIED with regard to the FFCRA claims (Claims I, II, III, and IV). An appropriate Order will enter.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE